UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DMITRIY SHULGAN, LYUBOV SHULGAN, and their marital community, PETER RADCHUK, SERAFINA RADCHUK, and their marital community,<br><br>        Plaintiffs,<br><br>    vs.<br><br>PETER NOETZEL, JANE DOE NOETZEL, SEAN WALTER, JANE DOE WALTER, JANE DOE, JOHN DOE, and SPOKANE COUNTY,<br><br>        Defendants. | NO. CV-07-051-JLQ<br><br>**ORDER DENYING MOTIONS TO STRIKE; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

   **BEFORE THE COURT** are Defendants' Motion to Strike Declaration of Dmitriy Shulgan (Ct. Rec. 41), Defendant's Motion to Strike Declaration of D.P. VanBlaricom (Ct. Rec. 44), and Defendants' Motion for Summary Judgment (Ct. Rec. 18). A telephonic hearing was held on Thursday, March 6, 2008. William Edelblute, Esq. participated on behalf of the Plaintiffs and Heather Yakely, Esq. participated on behalf of the Defendants. After the hearing, the Court allowed the parties opportunity to file supplemental declaration(s), which the Defendants have supplied. Having considered the written submissions and oral arguments of the parties, Defendants' Motion for Summary Judgment is Granted.

## I. INTRODUCTION

   Plaintiffs in this action assert a right to recovery and declaratory judgment against present and former Spokane Valley and Spokane County police officers based on their

alleged violation of 42 U.S.C. § 1983.  More specifically, Plaintiffs allege that Defendants unlawfully detained them, arrested them without probable cause, and used excessive force during their arrest.  In addition, Plaintiffs allege causes of action for negligence, emotional distress and loss of consortium. Defendants have moved this court for summary judgment because (1) probable cause or reasonable suspicion existed for Plaintiffs detention; (2) probable cause existed for the Plaintiffs arrests; (3) the force used against Plaintiffs did not rise to the level of a constitutional violation; (4) Defendants are shielded from liability by the doctrine of qualified immunity with respect to Plaintiffs' federal claims; and (5) Defendants are not liable on Plaintiffs' state law claims. Plaintiffs oppose the motion, arguing that triable issues of fact exist as to their federal claims. Plaintiffs have not opposed the dismissal of their state law claims.  Each of these arguments will be considered below in turn.

## II. FACTS

The following facts are undisputed unless otherwise noted.

Defendants in this case are Spokane County, and Spokane County Sheriff's Deputy Sean Walter and former Deputy Peter Noetzel, who in February of 2004 were providing police services for the City of Spokane Valley.  Both Plaintiff Dmitriy Shulgan and Peter Radchuk were in their 50s at the time of the incident and are Russian immigrants.  They have been in the United States for at least ten years.  Though English is not their native language, both Mr. and Mrs. Shulgan and Mr. Radchuk have attended English as a Second Language classes.

On the evening of February 19, 2004, around 6:40 p.m., which is after dark in this geographical location and time, police, including deputies Walter and Noetzel, responded to a domestic violence call at 717 South Steen Road, Spokane Valley, which is on a private dirt road with no sidewalks.  The Shulgan residence is located at 821 South Steen Road.

While Deputy Walter was standing at or near the residence at 717 S. Steen Road he observed two males standing near a patrol car parked on Steen Road in front of the

717 S. Steen Road residence.  The men were "yelling and screaming" in a foreign
language while looking at Deputy Walter.  Ct. Rec. 21, Ex. C at 17.  Deputy Walter's
police report indicates this continued for 5 minutes and then the men walked northbound
on Steen Road still yelling.   Meanwhile, Deputy Noetzel was driving a patrol car
southbound toward 717 South Steen and as he did so, he encountered  two males
walking in the middle of the road in the direct path of his patrol car. The patrol car was a
marked Spokane Valley patrol car with lights, which were not activated. Deputy Noetzel
slowed as he approached the individuals as he thought the walkers would move to either
side of the road as he neared. Deputy Noetzel's narrative report states that "One of the
males, Radchuk, moved so that he was centered on the front of my car even more than he
had been.  Shulgan pushed him to the side slightly, but they both stayed in the N/B lane
of travel. There was enough room on either side of the road for the two men to walk.  It
appeared as if the males were intentionally walking in my lane." Ct. Rec. 21 at 149.
Because the men did not move, Deputy Noetzel drove around them.  There was room for
him to drive around.   Mr. Shulgan admits he and Mr. Radchuk were walking north on
Steen Road.  Mr. Shulgan denies that he yelled at anyone or that he "did anything to
block a police car." Ct. Rec. 31 at 3.

        After the unrelated domestic violence call at 717 South Steen was cleared, Deputy
Walter told Deputy Noetzel about the yelling and Deputy Noetzel informed Deputy
Walter about the men in the road.  They jointly agreed to try to make contact with the
men because it was unknown to them why they were in the area, who they were and why
they were yelling and blocking a police vehicle. Deputy Noetzel and Deputy Walter,
dressed in police uniforms, headed south in separate marked patrol cars on Steen road
and found the two males on the driveway of 821 South Steen walking toward Steen
Road.  Deputy Walter used his spotlight to illuminate the two men.  He got out of his car,
identified himself, and told the men to stop.  Both men stopped initially. Mr. Radchuk
stopped at Deputy Walter's command, about 30 feet away, and remained there until later
approached by the deputies.  Mr. Shulgan continued walking toward the officer, while

1

attempting to block the spotlight from his face with his hands, trying to see the officer.
Deputy Walter asked Mr. Shulgan to take his hands out of his pockets.  Mr. Shulgan
claims he did not recognize the police cars initially, that he heard "conversation" but did
not understand the officer's initial commands.

When Mr. Shulgan did not stop, Deputy Walter yelled loudly "Police, Stop" and
claims he gestured with his hand.  Mr. Shulgan admits he saw the police car and heard
someone yell "stop" at him, which he understood.  Mr. Shulgan (now about 15 feet
away) stopped, put his hands back in his coat pocket, and then continued to take steps
toward Deputy Walter.  Ct. Rec. 21, Ex. C at 25.  Mr. Shulgan claims he only took a few
more steps out of "inertia", and asked "What Reason?" in English. The spotlight was in
Mr. Shulgan's eyes.  Deputy Walter interpreted the manner in which Mr. Shulgan had
continued walking toward him as aggressive and threatening.  Deputy Walter then
deployed his taser giving Mr. Shulgan a five-second "cycle" of electric shock.  Mr.
Shulgan fell to the ground.  Deputy Walter commanded Mr. Shulgan to put his hands
behind his back and stop fighting or resisting, but Shulgan did not comply.  Deputy
Walter then delivered a second five-second application of the taser.  Deputy Noetzel ran
to Mr. Shulgan and while he was face down commanded Mr. Shulgan to put his hands
behind his back.  Both Deputy Noetzel and Deputy Walter then attempted to restrain Mr.
Shulgan, who was combative, was rolling on his side and swinging his arms at the
deputies. Mr. Shulgan claims he did not understand the officers' commands.  Deputy
Walter then used the taser to perform a touch stun called a "stun drive."  Mr. Shulgan
claims his head was struck and that he was knocked unconscious.  Deputies eventually
handcuffed Mr. Shulgan.  Mr. Shulgan testified at his deposition he had no recollection
of struggling with the officers, although he admits to "fighting" after being tasered.  Ct.
Rec. 21, Ex. G at 98. Mr. Shulgan admits he understood what "stop" meant.

After Mr. Shulgan was in handcuffs on the ground, the deputies then both
approached Mr. Radchuk.  Deputy Noetzel told him he was under arrest for disorderly
conduct, based upon his failure to move aside for vehicular traffic on the road. Radchuk

initially began to comply with the request to put his hands behind his back, but then he tensed his arms and began to resist, swinging his arms, striking both deputies, tearing a part of Deputy Walter's uniform, and ripping off his lapel microphone.   Deputy Walter "foot swept" him causing to fall to the ground, applied several taser stuns to his back, and applied a leg strike to his side during the struggle.  Both deputies' attempts to taser Mr. Radchuk did not stop him.  Mr. Radchuk broke away from the deputies and then ran. Both deputies chased after him.  Deputy Walter pepper-sprayed Mr. Radchuk but he continued to run.  Eventually, physical contact was made in a field when Deputy Noetzel pushed him from behind and Mr. Radchuk fell over a low-wire fence.  Deputies used pepper spray, body strikes, and a number of "touch stuns" to try to obtain control of his arms and his hands to handcuff him.

Mr. Radchuk recalls very little of the entire incident.  He recalls going to the Shulgan residence for dinner.  He recalls seeing Mr. Shulgan on the ground, he recalls seeing the deputies after his arrest when they lifted up his shirt and were inspecting his body, and he recalls being tasered, but doesn't remember when.

Mr. Shulgan believes he remained on the ground unconscious and unable to move for approximately an hour during the time the deputies were chasing and restraining Mr. Radchuk.  He claims that he regained consciousness and called for help but no-one was around. He then got up and walked back to his house, where the deputies later located him still in his handcuffs.  There were family members present when Deputy Walter advised Mr. Shulgan to come out of the house.  Mr. Shulgan walked out and Deputy Walter escorted him.  According to Deputy Walter, Mrs. Shulgan pulled on his arm pulling him toward her.  Mrs. Shulgan denies having pulled on his arm, but admits having "screamed" at him "don't touch my husband."  Ct. Rec. 32.  According to Deputy Walter, Mr. Shulgan then tensed his arms and began to pull away and so Deputy Walter took him to the ground.  Mrs. Shulgan was placed under arrest for obstruction of a police officer.

Mr. Shulgan was charged with assault third degree (2 counts), resisting arrest, obstructing a public servant, disorderly conduct, and escape 3rd degree. Mr. Radchuk was arrested on charges of assault third degree (2 counts), resisting arrest and disorderly conduct. All criminal charges were later dismissed.

After their release from jail on February 21, 2004, Mr. Shulgan and Mr. Radchuk sought medical treatment at Holy Family Hospital emergency room. Mr. Shulgan was assessed to have a right shoulder strain, right hip strain, abrasions, and hemorrhage to his right eye. Mr. Radchuk was assessed with multiple superficial burns.

Spokane County utilizes a Use of Force policy which recommends various levels of force officers may use. Spokane County also has a specific policy addressing the use of the taser.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden

the law places on that party. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *See Nissan Fire & Marine*, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## IV. DISCUSSION

**A.    Defendants' Motions to Strike**

Defendants' have filed two separate motions to strike portions of several declarations filed by the Plaintiffs in their opposition to the motion for summary judgment.  Specifically, Defendants move to strike:

1) Portions of the Declaration of Dmitriy Shulgan (at Ct. Rec. 51) , on the primary basis that certain statements contained therein are not relevant; and

2) Three statements contained in the Declaration of Defendants' expert, D.P. Van Blaricom (at Ct. Rec. 26), on the basis that he offers conclusory opinions and opinions on ultimate issues of fact.

The three items in the Van Blaricom declaration that Defendants' seek to have stricken are:

1)    Van Blaricom's list of what he considered were the facts "uncontroverted in the record."

2)    Van Blaricom's statement that "it is my considered opinion that this was a totally unnecessary exercise of law enforcement authority that is known in the police vernacular as 'contempt of cop' or having failed the 'attitude test.'

3)    Van Blaricom's statement that "...plaintiffs were the victims of objectively unreasonable excessive force."

It is unnecessary to actually "strike" anything from the record before ruling on the summary judgment.  The court may simply disregard those facts that are irrelevant, without adequate foundation, or concerning ultimate questions before the court.

ORDER - 7

Accordingly, the Defendants' motions to strike are therefore **DENIED**.

**B.     42 U.S.C. § 1983**

Section 1983 creates a cause of action against any person who, acting under color of state law, violates the constitutional rights of another person; *Mabe v. San Bernardino County, Dep't of Public Soc. Serv.*, 237 F.3d 1101, 1106 (9th Cir. 2001). To succeed on a § 1983 claim, Plaintiffs must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived him or her of a constitutional right. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). A public official may be immune from liability for acts performed in his official capacity under either the doctrine of absolute immunity or qualified immunity. *Mabe*, 237 F.3d at 1106. Generally, the "presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 409, 433 n. 4 (1993).

In determining whether Defendants are entitled to qualified immunity, the court must first determine whether Plaintiffs have stated a prima facie claim that Defendants violated one of their constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 198, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Brittain v. Hansen*, 451 F.3d 982, 988 (9th Cir. 2006). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*  If the court determines that Plaintiffs presented a prima facie case assuming the truth of the Plaintiffs' allegations, it must ascertain "whether that right was 'clearly established' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brittain*, 451 F.3d at 988 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1152 (9th Cir. 2005). "This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case." *Id.* (*quoting San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 971 (9th Cir. 2005)).

1

**1. <u>Unlawful Arrest</u>**

2  The Fourth Amendment protects individuals from unreasonable intrusions "in
3  their persons, houses, papers, and effects," see U.S. Const. amend. IV; *Katz v. United*
4  *States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and therefore imposes
5  procedural safeguards governing police-citizen encounters.  The Supreme Court has
6  identified three types of police/citizen encounters: consensual encounters, investigative
7  stops, and arrests.  *See cases listed in United States v. Davis*, 94 F.3d 1465, 1467-68
8  (10th Cir. 1996) (citations omitted).  These categories are not static and may ascend from
9  one to another.  *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996). The
10  Fourth Amendment's safeguards do not foreclose all police-initiated encounters or
11  questioning. *See Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389
12  (1991)((noting that "[A] seizure does not occur simply because a police officer
13  approaches an individual and asks a few questions. So long as a reasonable person would
14  feel free "to disregard the police and go about his business, the encounter is consensual
15  and no reasonable suspicion is required.") (citation omitted).  No consensual encounters
16  occurred here.  However, an investigative stop or detention is a type of seizure, short of
17  an arrest, requiring an officer to have a reasonable suspicion supported by articulable
18  facts that criminal activity may be afoot.

19  An arrest, on the other hand, must be supported either by a properly issued arrest
20  warrant or probable cause. Probable cause for a warrantless arrest arises when the facts
21  and circumstances within the officer's knowledge are sufficient to warrant a prudent
22  person to believe "that the suspect has committed, is committing, or is about to commit
23  an offense." *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (*quoting Michigan v.*
24  *DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Probable cause is
25  generally a question for the jury. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir.1984).
26  Summary judgment in favor of Defendants is appropriate only if no reasonable jury
27  could find that Defendants Noetzel and Walter lacked probable cause to arrest. *Id*.

28

1

Although unlawful detention is not a separate claim asserted by the Plaintiffs in the Complaint (but unlawful arrest is), Plaintiffs contend the Defendants not only did not have the authority to arrest, but did not have the authority to conduct an investigatory stop and subsequent detention of Mr. Shulgan and Mr. Radchuk. Plaintiffs argue that because there was no authority to order the Defendants to stop, events occurring after being told to stop cannot justify reasonable suspicion or probable cause to arrest. Defendants argue that the prior actions and resistive behavior of both men gave the deputies probable cause to arrest.

Even if the deputies had initially only intended to effectuate a "citizen contact" or consensual encounter, as Defendants have argued, Deputy Walter did not confine his conduct to a request to talk to the men. Instead, he shined the spotlight on the men, announced his presence, and instructed them to "stop", which rises to the level of an investigatory stop because a reasonable person would not have felt free to disregard the officer's instruction. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Ordering the men, who were walking in the officers' direction, to stop was lawful as officers are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985) (finding that an officer approaching an individual with his service revolver drawn and pointed into the air was well within the permissible range of a Terry stop where the individual was wanted for investigation due to possible involvement in an armed robbery and was reported to be armed and dangerous).

However, an investigative stop does not actually occur and the Fourth Amendment does not become relevant until the moment of seizure, and it is at that time that the presence or absence of reasonable suspicion must be evaluated. A seizure occurs when a suspect submits to an assertion of authority by police, or when police physically apply force to restrain a suspect. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). In the course of executing the investigatory stop through the demands that the men stop, Mr.

Radchuk was seized at the moment he submitted to the officer's assertion of authority and stopped. However, because Mr. Shulgan did not yield to Deputy Walter's show of authority, Mr. Shulgan was not "seized" for Fourth Amendment purposes until the commencement of his physical apprehension and arrest by the deputies.

*a. Mr. Radchuk's Detention and Arrest*

The question is whether reasonable suspicion of criminal activity existed to conduct the investigative stop of Mr. Radchuk at the time he complied with Deputy Walter's order to stop. Such an investigatory stop satisfies the Fourth Amendment only if the police officer has a "a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The inquiry into "reasonable suspicion" is less demanding than for probable cause, but the officer must "articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Particularized suspicion has two elements. *Montero-Camargo*, 208 F.3d at 1129. First, the assessment must be based upon the totality of the circumstances. *Id.* Second, the assessment must create a reasonable suspicion that the person being stopped has committed or is about to commit a crime. *Id.* Conduct that is "entirely innocuous" when viewed in isolation may, when considered with other circumstances, properly lead to reasonable suspicion. *Id.* at 1130.

The reasonable suspicion inquiry does not depend upon "whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of 'noncriminal acts.'" *Sokolow*, 490 U.S. at 10. Innocuous conduct is insufficient to establish reasonable suspicion, unless there is "other information or surrounding circumstances of which the police are aware, which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity has occurred or is about to take place." *Montero-Camargo*, 208 F.3d at 1130. An officer's own experiences are relevant, but such experiences are not an independent factor in the analysis. *Id.* at 1130.

ORDER - 11

Rather, they provide a backdrop against which to view the facts as long as the officer draws objectively reasonable inferences. *Id.*

Police have the right to use some degree of physical coercion or threat thereof to effect an investigative stop. *McKinney v. City of Tukwila*, 103 Wn.App. 391, 402 (2000) *citing Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Various courts have recognized the lawfulness of law enforcement securing subjects in potentially dangerous situations. Officers are authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

In considering the events leading up to the officers' initial encounter with Mr. Radchuk and Mr. Shulgan, the officers had reasonable suspicion to stop and investigate Mr. Radchuk and Mr. Shulgan. According to Deputy Walter, he observed several males yelling and screaming at him from the road in a foreign language while he was investigating a domestic violence call. While Mr. Shulgan denies *he* yelled at anyone, Mr. Radchuk simply cannot remember whether he did. It also undisputed Deputy Noetzel saw the same two men walking on the roadway in the direct path of his vehicle's travel. As he drove toward them, the men failed to move to the side forcing him to steer around them. Based upon their behavior, it appeared to the deputy as though the men had intentionally blocked his path of travel. While either of these factors may have been in isolation been susceptible to innocent explanations, collectively they amount to suspicious circumstances and a reasonable suspicion that the offense of disorderly conduct had occurred.

Disorderly conduct is defined by RCW 9A.84.030 in relevant part as follows:

(1) A person is guilty of disorderly conduct if the person:
(a) Uses abusive language and thereby intentionally creates a risk of assault;
(b) Intentionally disrupts any lawful assembly or meeting of persons without lawful authority;
(c) Intentionally obstructs vehicular or pedestrian traffic without lawful authority....

(2) Disorderly conduct is a misdemeanor.

ORDER - 12

Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further. An officer's reasonable and articulable suspicion that an individual has committed the offense of disorderly conduct is sufficient to justify a temporary detention of that individual for investigative purposes. Based upon the undisputed facts of Mr. Radchuk's behavior in the road, the deputies had reasonable suspicion sufficient to justify temporarily detaining Mr. Radchuk for further investigation.

After Mr. Shulgan's intervening actions and arrest, the officers admit they then approached Mr. Radchuk and without further questioning, Deputy Noetzel informed him he that was under arrest for disorderly conduct based his actions blocking traffic on Steen Road. At that moment, the detention was no longer considered an investigative stop, and probable cause was required for the detention. Whether the officers had probable cause to arrest Mr. Radchuk at that moment is a closer question. However, even assuming they did not have probable cause, Mr. Radchuk did not have the right to resist his arrest and flee. *State v. Valentine*, 132 Wash.2d 1, 935 P.2d 1294 (1997) (individual may not use any force to prevent an arrest which threatens only a loss of freedom). Even if the arrest is unlawful, the law requires a person "to submit peacefully to the inevitable and to pursue his available remedies through the orderly judicial process." *Id.* at 19 (quoting *People v. Curtis*, 70 Cal.2d 347, 450 P.2d 33, 36-37, 74 Cal.Rptr. 713 (1969)). Accordingly, Mr. Radchuk's undisputed violent behavior swinging his arms and striking deputies, running from police and continuing to resist while the officers attempted to handcuff him clearly provided them with probable cause to arrest him for resisting arrest. *See Barry v. Fowler*, 902 F.2d 770, 773 n. 5 (9th Cir.1990) (explaining that when there is one arrest for multiple crimes, and the court determines there was probable cause for one of the charges, it does not matter whether there was probable cause for the other charges).

b. *Mr. Shulgan's Detention and Arrest*

It is undisputed that Mr. Shulgan continued to walk toward Deputy Walter, failing to obey his repeated instructions to stop and to take his hands out of his pockets. This caused Deputy Walter to have to abandon his original intention to investigate the men, and focus his effort instead on attempting to secure his own safety and restrict Mr. Shulgan's possibly dangerous movements. Because Mr. Shulgan was not cooperating and the personal safety of the officer became a concern, Officer Walter was justified in utilizing an intrusive technique in effectuating the stop based upon Mr. Shulgan's failure to stop and remove his hands from his pockets as ordered. Thereafter, despite having been tasered and fallen to the ground, Mr. Shulgan resisted being handcuffed, and forcibly struggled with the officers. A reasonable officer would have concluded that there was a fair probability that Mr. Shulgan had by then committed obstruction of justice, resisting arrest, and/or assault in the third degree, and therefore, probable cause existed to arrest Mr. Shulgan. See RCW 9A.76.020; RCW 9A.76.040; RCW 9A.36.031(g). No reasonable jury could find otherwise. Mr. Shulgan's assaultive behavior after being ordered to stop justified his arrest, and thus it is irrelevant whether the officers had probable cause to arrest Mr. Shulgan based upon the earlier incidents on the road. *See Barry v. Fowler*, 902 F.2d 770, 773 n. 5 (9th Cir. 1990) (explaining that when there is one arrest for multiple crimes, and the Court determines there was probable cause for one of the charges, it does not matter whether there was probable cause for the other charges).

c. *Mrs. Shulgan*'s *Arrest*

Mrs. Shulgan was arrested for obstruction of an officer. Deputy Walter claims that while he was escorting Mr. Shulgan out of the house she grabbed his arm. She denies this. However, it is admitted by Mrs. Shulgan that she screamed at the arresting officer, "Don't touch my husband on my property." Ct. Rec. 32. The elements of obstruction are: (1) that the action or inaction in fact hinders, delays, or obstructs; (2) that the hindrance, delay or obstruction be of a public servant in the midst of discharging his official powers or duties; (3) knowledge by the defendant that the public servant is

discharging his duties; and (4) that the action or inaction be done knowingly by the obstructer, i.e, with the intent to hinder. *Sunnyside v. Wendt*, 51 Wn.App. 846, 851-52, 755 P.2d 847 (1988).  While the last three elements were clearly met, it is perhaps questionable whether Mrs. Shulgan's action did in fact hinder, delay, or obstructed the Deputy Walter.  However, probable cause exists when the facts and circumstances of the arresting officer point to the *probability* of criminal activity.  *State v. Greene*, 97 Wn.App. 473, 477, 983 P.2d 1190 (1999).  This standard gives officers broad latitude. The officer need not have evidence proving each element of the crime beyond reasonable doubt.  Given the tense, uncertain, and rapidly evolving circumstances, Mrs. Shulgan's admitted direct, hostile and aggressive verbal conduct toward the officer, viewed in light of the officer's expertise and experiences, were sufficient to warrant a person of reasonable caution to believe that the offense of obstruction of an officer had been committed.

d. *Conclusion*

No reasonable jury could find the Defendants did not have probable cause to arrest the Plaintiffs.  It is obvious that the failure to yield to an officer's reasonable commands, striking at deputies, and fleeing from deputies constitute probable cause to arrest. Moreover, Mrs. Shulgan's contact with the officer, whether physical and verbal, or merely just verbal, while he was attempting to secure the arrest of Mr. Shulgan, provided defendants with probable cause to arrest Mrs. Shulgan.  Accordingly, Plaintiffs' § 1983 claims for unlawful arrest should be dismissed.

**2. Excessive Force**

Defendants also seek summary judgment as to Plaintiffs' claims of excessive force, raising the defense of qualified immunity.   Under the first prong of the qualified immunity analysis the court must determine whether the facts alleged, taken in the light most favorable to the Plaintiffs, constitute a violation of the constitutional prohibition against the use of excessive force.  Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard and Fourth Amendment

ORDER - 15

jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat of coercion to effect it. *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989). The ultimate "reasonableness" inquiry in an excessive force case is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.

To determine whether the force used was reasonable under the circumstances, courts must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (citations omitted).  In performing this calculus, the court must "assess the quantum of force used" and then "measure the governmental interests at stake" by considering "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citations omitted).  Courts must use "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must make allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a given situation." *Graham*, 490 U.S. at 396-97.

Because cases involving police misconduct almost always involve disputed factual contentions and turn on credibility determinations, the Ninth Circuit has "held on many occasions that summary judgment or judgments as a matter of law in excessive force cases should be granted sparingly." *Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (2003) (citing *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir.1997) (citing several cases).   However, in this case, the deputies factual basis for their use of force is undisputed.  Mr. Radchuk has no recollection of the incident.  Mr. Shulgan recalls being struck with the taser, falling to the ground, after which he does not remember anything.  Plaintiffs have not put forth any evidence to refute the Deputies

accounts of their use of force and Mr. Shulgan and Mr. Radchuk's actions during their detention. These undisputed facts are set forth in detail above.

*a. Excessive Force Claims of Mr. Shulgan*

      *I. Initial Use of Force*

      Plaintiffs contend Deputy Walter's use of the taser gun three times on Mr. Shulgan constituted unreasonable use of force. The court finds each application of the taser was reasonably proportionate to the uncertain situation Deputy Walter faced in trying to effect the investigatory stop and subsequent arrest, and did not constitute excessive force. At the time Deputy Walter began to initiate the stop Deputy Walter had first hand knowledge to believe the two men had been behaving in an obstructive and hostile manner toward he and Deputy Noetzel. It was dark in a rural area and the deputies did not know anything about the suspects. When given the verbal command to stop, Radchuk stopped, but Mr. Shulgan continued to advance toward the deputy with his hands in his pockets. As he advanced, he tried to block the light of the spotlight from his face and again did not obey the officer's commands to him to take his hands out of his pocket and to stop. Mr. Shulgan then challenged Deputy Walter's lawful authority to investigate.

      Given the circumstances, Mr. Shulgan's failure to follow Deputy Walter's verbal commands, combined with his movement toward the officer, justified the need for the use of force. Given it was unknown whether Mr. Shulgan was armed, a reasonable officer would have concluded it was unsafe to approach to hands-on range. Moreover, the situation could have escalated into a serious physical struggle in which either the officer or Mr. Shulgan could have been seriously hurt. Although being struck by a taser is an unpleasant experience, the use of the single taser was reasonably proportionate to the need for force. See *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir.2004) (holding that officer's single use of taser gun to effect arrest of person who was agitated and uncooperative did not constitute excessive force, even though officer did not start with a verbal arrest command or an attempted physical handcuffing, because those

ORDER - 17

actions "would likely have escalated a tense and difficult situation into a serious physical struggle in which either [the plaintiff] or [the officer] would be seriously hurt.").

Unfortunately, the first taser did not cause Mr. Shulgan to cooperate. The second taser used by Deputy Walter occurred when Mr. Shulgan was on the ground and attempting to stand up. As the officers both struggled to handcuff Mr. Shulgan he was combative and refused to put his hands behind his back as told, at which time Deputy Walter used the "drive stun". Plaintiffs theorize that perhaps Mr. Shulgan's resistence was involuntary, that his lack of compliance could have stemmed from being dazed by the effects of being tasered, and that he could not have been actively resisting after having been tasered multiple times. However, there is no evidence in the record suggesting these possibilities existed in fact, or could be proven to be the case. Mr. Shulgan has no recollection of these events. Moreover, his attempt to stand and swinging his arms would, to the officers, suggest voluntary, rather than involuntary movements.

Plaintiffs also argue that once Mr. Shulgan was on the ground, there were other alternatives to overcome Mr. Shulgan's resistance than the use of the taser. There is ample case law to support the taser use and Plaintiffs own expert has concluded that the use of a taser to temporarily incapacitate a resisting subject is reasonable, given that other alternatives to overcome resistance, such as physically overpowering the arrestee, using a baton or other impact weapon, or using chemical agents all carry their own risks to both the officers and the arrestee.

There is no material issue that Mr. Shulgan flaunted repeated officer commands prior to being tasered and then resisted handcuffing after being tasered. Accordingly, the court finds that officer Walter's use of the taser was objectively reasonable.

*ii. Use of Force on Mr. Shulgan While Handcuffed*

Mr. Shulgan, after being handcuffed, walked back into his house while the officers were involved with Mr. Radchuk. Deputy Walter later found him there and ordered him out of the house. It is undisputed that Deputy Walter knocked Mr. Shulgan to the ground

after he came out his house while in handcuffs.  There is no evidence in the record disputing Deputy Walter's statement that this occurred when Mr. Shulgan began to tense his arms and pull away from him.  Mr. Shulgan claims, and the Defendants do not dispute, that Deputy Walter grabbed his neck and threw him to the ground.  Ct. Rec. 34 [Plaintiff's Stmt of Facts] ¶ 25.  A police officer is not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others and had neither committed, nor was suspected of committing, any crime.  *Jones v. Buchanan*, 325 F.3d 520, 534 (4th 2003).

While Deputy Walter's conduct here is closer to the line because Mr. Shulgan was handcuffed, a reasonable officer could arguably conclude that the use of force was appropriate under these circumstances.  Deputy Walter's use of force was not entirely indefensible because Mr. Shulgan tensed his arms and began to pull away.  Given Mr. Shulgan and Mr. Radchuk's prior resistive behavior, Deputy Walter's use of force could be viewed as reasonable to prevent further flight or struggle.  Moreover, "[n]ot every push or shove, even if it might later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted).

Even if the court were to conclude there was a triable issue as to whether the use of force during Mr. Shulgan's arrest was excessive by constitutional standards, Plaintiffs do not satisfy the second prong of the qualified immunity inquiry.   Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847. There is no support for the notion that Deputy Walter or Deputy Noetzel knowingly and deliberately violated Mr. Shulgan's right to be free from unreasonable seizure. Nor can their use of force be fairly characterized as so egregious as to suggest outright incompetence or intentional use of clearly unnecessary force.  At worst, the officers may have made errors of judgment, erring on the side of their own safety.

1

      *iii. Spokane County Jail Incidents*

2          In his deposition and declaration provided in opposition to Defendants' Motion for

3 Summary Judgment, Mr. Shulgan alleges that after his arrest he was mistreated by

4 workers at the Spokane County jail.  Defendants mention these allegations in their

5 statement of facts.  Because no claims based upon the incidents at the Spokane County

6 jail were pleaded in the Complaint, nor have Plaintiffs moved to amend, they are not

7 properly before the court and the court need not rule upon them.

8 *b. Excessive Force Claims of Mr. Radchuk*

9          Once again the deputies' accounts of the facts surrounding Mr. Radchuk's

10 arrest and the amount of force used are undisputed.   The officers' use of their tasers

11 multiple times, the leg sweep, pepper spraying, and strikes in attempt to apprehend the

12 combative and fleeing suspect were not excessive and were necessary to gain control of

13 Mr. Radchuk.  While Plaintiffs point out the relatively "de minimus" nature of the

14 original suspected offense, Mr. Radchuk's resistive behavior after contact with the police

15 was not "de minimus" and justified the officers' use of force.  Just as in Mr. Shulgan's

16 case, even if the court were to find a question of fact as whether the use of force was

17 excessive, Defendants would be entitled to qualified immunity because the officers' use

18 of force could not be fairly characterized as so egregious as to have been a knowing

19 violation of the law.

20 **3. <u>Municipal Liability</u>**

21          There are only limited ways in which a municipality may be held liable under §

22 1983.  A municipality may not be held responsible for the acts of its employees under a

23 respondent superior theory of liability. *Monell*, 436 U.S. at 691; *Fuller v. City of*

24 *Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). Rather, to state a claim for municipal

25 liability, a plaintiff must allege that he suffered a constitutional deprivation that was the

26 product of a policy or custom of the local government unit, *See City of Canton, Ohio, v.*

27 *Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), or that the

28 municipality ratified the unlawful conduct, *see Larez v. City of Los Angeles*, 946 F.2d

630, 646-47 (9th Cir.1991) .

Having found that Plaintiffs have not established an unconstitutional arrest or excessive force use by the officers, Plaintiffs cannot establish a valid section 1983 claim against Spokane County based upon ratification of the officers conduct. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") (emphasis in original); *Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir .2002) ("Exoneration of [the officer] of the charge of excessive force precludes municipal liability for the alleged unconstitutional use of such force").

Plaintiffs also contend the policy authorizing the use of the taser combined with a lack of adequate training provides justification for municipal liability. Even if the court were to assume a constitutional violation, there is no evidence that the failure to train these officers caused the violation. *See Canton*, 489 U.S. at 390, 109 S.Ct. 1197 (stating that, as a prerequisite for municipal liability, the failure to train "actually cause injury"). The Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In *Board of County Comm'rs of Bryan County, Okl. v. Brown*, the Supreme Court discussed three ways in which a county may be liable for inadequate training. 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The first is a deficient training program "intended to apply over time to multiple employees." *Id.* at 407 (citation omitted). The continued adherence by policymakers "to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to

trigger municipal liability." *Id.* (citation omitted). Second, a municipality may be liable if there is "the existence of a pattern of tortious conduct by inadequately trained employees" that is the " 'moving force' behind plaintiff's injury." *Id.* at 407-08 (citation omitted). However, a plaintiff must show more than simply "a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident." *Id.* at 408. Third, a plaintiff may prove a failure-to-train claim without showing a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 409.

Plaintiffs have not demonstrated a genuine issue of material fact as to whether the County acted with deliberate indifference. *See Monell*, 436 U.S. at 694. First, it is undisputed the County trains all of its deputies to use reasonable force proportional to the type of resistence the officer encounters.  Ct. Rec. 21, Ex. E.  The County also trains its deputies on the use of the taser. These policies do not demonstrate inadequacy rising to the level of deliberate indifference. Second, Plaintiffs have not produced facts suggesting that a pattern of tortious conduct by County deputies exists. *See Brown*, 520 U.S. at 407-08. Lastly, there is no evidence that officers encountered a highly predictable situation without proper training. *See Brown*, 520 U .S. at 407-09.

Accordingly, the court grants the Defendants' motion as to Plaintiffs' claims against the County.

## C. STATE LAW TORT CAUSES OF ACTIONS

RCW 4.96.020 provides:

No action shall be commenced against any local governmental entity, or against any local governmental entity's officers, employees, or volunteers, acting in such capacity, for damages arising out of tortious conduct until sixty days have elapsed after the claim has first been presented to and filed with the governing body thereof. The applicable period of limitations within which an action must be commenced shall be tolled during the sixty-day period.

The statute requires a claimant first present any claim for damages based on tort law to the governing body of the local government entity, then wait 60 days before filing suit.  *Medina v. Public Utility Dist. No. 1 of Benton County*, 147 Wash.2d 303, 316

ORDER - 22

(2002). Strict compliance with the pre-claim notice procedures is required. *Id.*; *Bosteder v. City of Renton*, 155 Wash.2d 18, 41 (2005). Failure to comply with the statutory claim-filing requirement requires dismissal of the claims. *See, e.g., Reyes v. City of Renton*, 121 Wash.App. 498, 502 (2004).

Based upon the record before the Court, Plaintiffs have not filed a notice of claim. Ct. Rec. 20 [Def. Stmt of Facts], at ¶ 5. Plaintiffs have provided no response or evidence to the contrary. Accordingly, Defendants summary judgment motion as to Plaintiffs state law claims must be granted and Plaintiffs' state law claims dismissed.

## V. CONCLUSION

Viewing this entire situation with hindsight, had Mr. Shulgan and Mr. Radchuk submitted peaceably to the officer's lawful exercise of authority in conducting the investigatory stop, these unfortunate incidents undoubtedly would not have occurred. However, the circumstances changed at the moment Mr. Shulgan and Mr. Radchuk challenged the officers' attempt to effectuate the investigatory stop. Even if it could be argued that less intrusive means would have been available to investigate and detain the Plaintiffs, that fact would not disqualify these officers from qualified immunity.

Accordingly, for the reasons set forth above, **IT IS HEREBY ORDERED**:

1.      Defendants' motions to strike (Ct. Rec. 41 and Ct. Rec. 44) are **DENIED**.

2.      Defendants' Motion for Summary Judgment (Ct. Rec. 18) is **GRANTED**.

The Clerk of the court is directed to enter this Order, enter judgment of dismissal of the Complaint and claims therein with prejudice, provide copies to counsel, and **CLOSE** the file.

**IT IS SO ORDERED**.

**DATED** this 10th day of April, 2008.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE